IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 15, 2015

**DOUGLAS L. LYLE, SR. v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County**
**No. 103472     Jon Kerry Blackwood, Judge**

_____

**No. E2015-00105-CCA-R3-PC – Filed December 4, 2015**

_____

The petitioner, Douglas L. Lyle, Sr., appeals the post-conviction court's denial of his petition for relief from his aggravated sexual battery conviction, asserting that he received ineffective assistance of counsel. After review, we affirm the judgment of the post-conviction court denying relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee, for the appellant, Douglas L. Lyle, Sr.

Herbert H. Slatery III, Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Charme P. Allen, District Attorney General; and Kit Rodgers, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was convicted by a Knox County Criminal Court jury of two counts of aggravated sexual battery involving his granddaughter and was sentenced to concurrent terms of twelve years. The petitioner appealed, and, on direct appeal, this court reversed one of the convictions following a determination that the State's election of offenses was inadequate as to one of the counts. The petitioner later filed an application for permission to appeal to the Tennessee Supreme Court, which the court denied.

The underlying facts of the case were recited by this court on direct appeal as follows:

[The victim] testified that she was eleven years old at the time of trial in July 2011. Her birth date was June 4, 2000, and she had just finished the fifth grade. She lived with her mother, her stepfather, and her brother, who was twelve years old. She also had three sisters who lived with her father.

As [the victim] was growing up, she visited her father's parents, the [petitioner] and his wife, Delilah ("Grandmother"). Sometimes she would spend the night with them. She testified that she loved her grandfather, the [petitioner], whom she called "papaw." She also stated that he had made her uncomfortable by touching her "wrongly." When asked where he touched her, she testified, "[m]y private."

The prosecutor then showed [the victim] a drawing of a girl. As the prosecutor pointed to different areas of the drawing's body, [the victim] identified them with her own words, including "chest," "butt," and "private." She stated that she knew what the word "vagina" meant, explaining that it referred to "[a] girl's part." She agreed that she meant the same by the word "private."

The prosecutor next showed [the victim] a drawing of a man. When asked what she called "the front private part where a man goes pee out of," she responded, "[p]rivate." She confirmed that she had heard the word "penis" and stated that it was a "boy's front part." She agreed that her word "private" and the word "penis" referred to the same thing.

When asked where the [petitioner] had touched her, [the victim] stated, "[m]y chest, my private, and my butt." She added that it had happened more than once but not every time she visited. It started when she was in kindergarten and ended when she was ten years old. She added that the last time it happened, she was between the fourth and fifth grade.

[The victim] testified that the touchings occurred in her grandparents' living room. She remembered it happening in the [petitioner]'s brown leather recliner chair. It also happened on a couch in the living room and in the [petitioner]'s bedroom. She explained that, on one particular occasion, she was sitting next to the [petitioner] in his recliner while they watched television. He touched her "private" with his

2

hand, and the touching was both over and under her underwear. While his hand was under her underwear, he rubbed, which felt "bad." He also put his finger inside of her, which felt "scratchy." She also described the sensation as "feel[ing] kind of weird." She stated that he put his finger inside of her more than once. She also stated that he would touch her "private part" without putting his finger inside.

[The victim] testified that the [petitioner] also rubbed her "private part" through her clothing, without putting his hand inside her clothing, while they were sitting on the chair.

When asked what happened on the couch, [the victim] testified that the [petitioner] touched her chest with his hand. She stated that this did not occur "that much." This touching occurred over her clothing. He also touched her chest while she was sitting on his bed in his bedroom. She was not sure if he ever touched her "private" in the bedroom. He did not touch her "private" on the couch.

When asked if the [petitioner] said anything while touching her, [the victim] testified that he told her, "Don't tell or we'll both get in trouble." Nevertheless, she told her mother in October 2009 about the touching. She explained that she had not told anyone before because she was "scared and embarrassed." She added that she was scared that no one would believe her. When her mother first came to her and inquired, she told her mother "no" because she was "too scared." She also testified that no one else had touched her like that.

On cross-examination, [the victim] stated that the touchings usually occurred in the mornings while Grandmother was still asleep. She also stated that she had discussed the matter with her mother four times.

The victim's mother ("Mother"), testified that she and the victim's father ("Father") had divorced about four years previously. She currently was married to George Michael Ailey, and the victim and her brother lived with her and Ailey. While she and Father were married, they lived with Father's parents, the [petitioner] and Grandmother. Mother stated that her in-laws "were just like a mom and dad to" her. After she and Father divorced, "things seemed okay at first." After she married Ailey, however, "it seemed like things kind of went downhill from there." She added that she did not feel as if they "cared for [Ailey] a whole lot." However, they

3

attended her wedding to Ailey.  After the divorce, her children continued to spend time with the [petitioner] and Grandmother.

Mother testified that the victim began wetting her pants in school when she was in second or third grade.  After [the victim] told her what had happened, her accidents at school declined and then stopped.

Mother testified that she had a "very vivid dream" one night in which she "found a pair of panties."  Ailey and Ailey's father were in the dream.  She awoke from the dream "frantic" and became concerned about her children.  The next day, she sat both her son and the victim down and asked them if anyone had ever touched them inappropriately.  [The victim] shook her head, but Mother noticed that her eyes were filled with tears.  Mother called the victim's school to speak with a guidance counselor for advice.  She was given the number for ChildHelp, and she called them.  The next day, she took the victim in to speak with a counselor.

Later, Grandmother and "Aunt Mo"[1] visited and spoke with the victim outside of Mother's presence but with her permission.

On cross-examination, Mother testified that she and Father married in February 1997.  They had two children, the victim and her older brother, Nicholas.  They divorced in May 2007.  After she and Father split up, she and the children moved in with the [petitioner] and Grandmother ("the Lyles") and lived with them for about one year.  The Lyles helped with child care and took care of the children when needed.  There were often other children there, as well.  Mother dated while she lived with the Lyles, sometimes staying out all night.  When she began staying out all night frequently, Grandmother told her that "she felt that [Mother] was neglecting the kids."  Mother started spending more time with the kids.

Mother sometimes took [the victim] with her on her nights out, and they would stay with the man she dated before Ailey.  [The victim] would sleep on the floor next to the bed that Mother shared with her boyfriend.

Eventually, she and the children moved into a house with Ailey.  Sometimes when the children were at Father's on the weekend, she and Ailey would have a party with other people.  These parties included

---

[1] Mother explained that "Aunt Mo" was Grandmother's sister.

4

alcohol, and sometimes women would flash their breasts.

Officer Mark Amos Taylor of the Knoxville Police Department ("KPD") testified that he was an investigator in the family crimes unit. He spoke with the [petitioner] at the [petitioner]'s home about [the victim]'s allegations. The [petitioner] denied the allegations but acknowledged that he and [the victim] would sit in his recliner together. According to Officer Taylor, the [petitioner] explained [the victim]'s actions that resulted in his hand sometimes touching her as follows: "She crawled out of the chair – well, she crawled. She just rolled over face first and would go out. She'd do that all the time, like, and I kept telling her because my hand hit – would end up in the wrong place, and I kept telling her, '[the victim], you're breaking my arm. I can't do that.' " Officer Taylor returned to the [petitioner]'s house at a later date and spoke with both the [petitioner] and Grandmother. Officer Taylor testified that, at that time, the [petitioner] told him that he was impotent.

Officer Taylor took a more "formal" statement from the [petitioner] in February 2010 at the KPD. Investigator Lynn Everett also participated in this interview, which was video-recorded. The video-recording was admitted into evidence and played for the jury. During the interview, the [petitioner] admitted to touching [the victim]'s genital area with his hand two or three times, and he also admitted that he did so because it excited him. Toward the end of the interview, the [petitioner] voiced an apology to the victim which Officer Taylor wrote down. The [petitioner] reviewed the written apology after it was completed and signed it. The apology was admitted into evidence and provides as follows:

> [The victim],
>
> I did not intend on hurting you when I rubbed you on your privates (vagina). I didn't intend on it to happen; but, it did and I am very sorry! I hope you can forgive me and get along with a "well-prosperous" life. You did nothing wrong – I did and I'm sorry!

On cross-examination, Officer Taylor admitted that there was no physical evidence corroborating [the victim]'s allegations.

The [petitioner] testified that he was seventy-one years old. He had been married to Grandmother for thirty-five or thirty-six years, and they

had two sons. One of his sons, Father, had five children, one of whom is [the victim]. Mother was the mother of [the victim] and Nicholas, and Father's other three children were by Mother's sister, Ashley. He stated that he was close to his grandchildren and loved them "to death." Ashley's children continued to visit him.

According to the [petitioner], Father and Mother dated in high school and eventually married. Father and Mother lived with the [petitioner] and Grandmother for a time. Later, they moved out and started their family. When Father and Mother divorced, Mother and the children returned to the [petitioner]'s house to live. The [petitioner] testified that he had no ill feelings toward Mother about the divorce, and he told her that she was the daughter he never had. Over time, however, he and Grandmother became concerned about Mother's dating behavior, particularly when Mother would take [the victim] with her on overnight dates. Eventually, Mother moved out, taking [the victim] and Nicholas with her. At that time, she was dating a man named Michael. The [petitioner] continued to see [the victim] and Nicholas frequently at the [petitioner]'s house.

The [petitioner] stated that "all kids" were welcome at his house and that he frequently had children other than his grandchildren visiting. Grandmother's sister's children visited, and his own sister's children visited. Lots of children visited during holiday celebrations.

The [petitioner] stated that he played checkers and put together puzzles with [the victim] and that they also baked brownies and funnel cakes together. He never had a problem with [the victim]. When he sat in his favorite chair, she would climb up into his lap. Sometimes she would take a nap in his lap. He testified that nothing improper ever took place in his chair, on the couch in the living room, or on his bed.

The [petitioner] testified about [the victim]'s movements when getting out of his chair:

> Normally, she would just get out, but there was one particular time that she was sitting on my left leg, and I had my arm on the chair, the recliner, and she rolled over the back of my hand and rolled off, and I felt her pelvis bone on the back of my hand as she rolled off. When that first happened, you know, I didn't think much about it. But kids climb all over you, get on your back and everything. I didn't think a

6

whole lot about it the first time. The second time that it happened I said, "[The victim], don't do that. You're hurting my hand." So she didn't say anything. She went on. A little while later she come [sic] back, she got back in my lap again, and she sat there a few minutes, and she rolled off again. I said, "[The victim], don't do that. You're breaking my hand." She wasn't hurting me, but I just wanted her to stop, because I was real uncomfortable with her doing that to me.

And I had – I had cut myself with a grinder that had a cut off blade in it on my finger, which I still got a scar from it, and it was in the bend of my finger which it healed kind of like a callous, a real – just not – didn't have a scab on it, more of a callous over it, and it was real rough. That third time she got off, she went to the bathroom where my wife was at, and my wife come [sic] in and jumped all over me, because she had a scratch.

When asked where [the victim] had been scratched, the [petitioner] testified, "I didn't know where at. It was in her private area, leg or thigh – inner thigh. I don't know where it was at." He also speculated that his watch or one of his fingernails caused the scratch.

The [petitioner] recalled Officer Taylor coming to his house and speaking with him. He told Officer Taylor "seven, eight, nine times" about [the victim] sliding off of the chair. He told Officer Taylor that Grandmother could verify what had happened, and he asked Officer Taylor to return to the house to speak with her. When Officer Taylor returned, they both spoke with him together.

After these interviews, Nicholas and [the victim] visited only once or twice more, and he did not speak with [the victim] on either occasion. The [petitioner] was very unhappy and upset about the separation from his grandchildren. He determined "to find out what it was that was affecting [his] granddaughter that she would make these allegations against [him]." Accordingly, he set up the meeting with Officer Taylor in February.

About a year previously, the [petitioner] testified, he had been to visit his doctor and had been prescribed Xanax. Occasionally, he would take one-half of a tablet at night to help him sleep. On the morning of his meeting with Officer Taylor at the police station, he was very nervous. He

7

took a whole Xanax and, when he remained nervous, took two of his wife's. He stated that he had never taken Xanax during the day before and "had no idea how they would affect [him] during the day." He took them because he thought they would "just . . . relax [him] to where [he] wouldn't be nervous."

He arrived at the police station on time. He first spoke with Officer Everett. By the time Officer Taylor joined them, the [petitioner] was feeling "[p]retty much out of it." When asked what he remembered about his conversation with Officer Taylor, the [petitioner] testified,

> I remember him coming in. I remember the statement coming up about her sliding off my hand, and I remember Taylor telling me that I was lying about that, and that upset me real bad, and I told him that I'm not no child molester, and that's pretty much all I remember about the whole thing.

Asked how he felt when he left the police department that day, the [petitioner] testified,

> I – I don't remember. I know I was in a room, and I don't remember leaving that room, but I remember walking through a door to the lobby. When I seen [sic] my wife, my wife and I walked outside. I remember I felt like a – I guess if you was [sic] a zombie, that's what I felt like. I was just – my whole body was just numb.

He realized later that his statement had not "gone well" for him.

On cross-examination, the [petitioner] testified that his relationship with [the victim] had been special, that she was his first granddaughter. He remembered when [the victim] complained that he had hurt her and put a mark on her skin near her "privates" because his wife spoke to him about it, and she was upset. He heard his wife tell [the victim] to never let anyone touch her private area. The [petitioner] showed the jury the scar on his hand where the callous had been. He reiterated that [the victim] had rolled off the recliner arm over his hand three times on that day. He did not hear [the victim] say anything to indicate that she was in pain. When his wife confronted him, he told her what happened. [The victim] was standing there, and when Grandmother asked her, "Is that what happened?", [the

8

victim] said, "yes."

The [petitioner] stated that he did not remember telling Officer Taylor that he had touched [the victim]'s vagina several times. He also did not remember telling Officer Taylor that [the victim] liked to be rubbed down there. He did not remember Officer Everett asking him about any medications he had taken that morning. He did not remember telling Officer Everett that he had not taken any medications other than his insulin and blood pressure medication. He did not remember telling Officer Taylor that [the victim] had grabbed his hand one time and put it on her breast, but he did recall [the victim] grabbing his hand one time and putting it on her chest with both of her hands.

Dr. David T. Stafford testified that he is a toxicologist. Asked about the effects of Xanax, Dr. Stafford explained that it can cause a drop in blood pressure, an increase in heart rate, and "a degree of confusion and some short-term memory loss." He emphasized that it does not affect everyone in the same way. He reviewed the [petitioner]'s videotaped statement and opined that there were "some slight indications" that he was under the influence of Xanax. Dr. Stafford explained: "At some times he was hesitant about answering questions and – as if he maybe didn't quite understand, but he eventually answered every question, I think, that was asked him, and he was, at times, a little – perhaps a little confused. He was hesitant." He agreed that the [petitioner]'s failure to remember the interview could be an effect of Xanax. He also testified that, if a person was accustomed to taking one-half milligram of Xanax and then took three milligrams, the possibility of greater confusion would be increased.

Kenneth Wayne Maples testified that he had known the [petitioner] all his life. He worked with one of the [petitioner]'s sons and knew Mother. He attended parties at Mother's house. The children, [the victim] and Nicholas, were present at these parties. He described the parties as involving alcohol and "flashing." He stated that the parties "got wild a lot" and were "free-spirited." He added that he had seen "a lot of touching between people, kissing, crotch grabbing, stuff like that." According to Maples, [the victim] saw some of these activities.

Maples testified that Ailey disciplined the children by speaking "very, very loud" to them and that he was very stern, frequently sending them to their bedrooms, where he would lock them in. [The victim] and Nicholas "really didn't care for it." He also testified that, when [the victim]

would greet him, she would "run and jump and hug [him] . . . with her arms, and then wrap her legs around [him] at the same time." This made him uncomfortable so he would pull her away and put her on the floor. He also saw [the victim] run and jump on the [petitioner] while he was sitting on the couch, straddling him. He described the [petitioner]'s response to [the victim]'s conduct as "uncomfortable," and he heard the [petitioner] telling her to quit "multiple times."

Doug Lyle, Jr., testified that he is the [petitioner]'s son. He and his son, who was fifteen, lived with the [petitioner]. Many children continued to visit frequently, and the [petitioner] behaved "like any grandfather should." He described the [petitioner] as "the most honest man I know."

Whitney Hardy testified that the [petitioner] is her uncle. She is the daughter of Grandmother's sister. She had known the [petitioner] her whole life and described the [petitioner] as "like a dad to me." As she was growing up, she spent the night at the [petitioner]'s house "[a] lot." He never gave her a reason to be afraid. She has three children, two girls and a boy, and they continue to spend time with the [petitioner]. She had seen [the victim] with the [petitioner], and [the victim] never showed any fear or concern about being with the [petitioner].

Hardy knew Mother and Ailey, and she lived next door to them for about a year. She did not like Ailey and stated that he "wasn't very nice" to [the victim] and Nicholas. She added, "He didn't really ever talk to them except for to tell them to go away." He also yelled at them "a lot."

On cross-examination, Hardy stated that she had watched the video-recording of the [petitioner]'s interview with Officer Taylor. She also stated that she continued to visit the [petitioner] with her children.

Jody Monroe testified that the [petitioner] was her uncle. She grew up around the [petitioner] and spent "97 percent" of her time at his house. She described the [petitioner] as "[m]ore like a father for me." She was "[v]ery comfortable" spending time alone with him, and he never touched her improperly.

Monroe has three children, and she was very comfortable with them all spending time with the [petitioner]. She preferred that her eldest daughter did not spend time alone with [the victim], however, because [the victim] "was just a little faster than [her] daughter." She explained that [the

victim] was "[m]ore advanced" with respect to "[s]exual stuff." She also stated that she had seen interactions between [the victim] and Ailey and saw Ailey yell at the children "[m]any times."

On cross-examination, Monroe acknowledged that she had watched the videotaped interview of the [petitioner] and stated that some of the things he said surprised her. She also stated that, during the interview, the [petitioner] was "not the Doug that I'm around all the time." She explained that her perceived discrepancy was based on "[t]he things that he was saying, and the way they were coming out, I guess. He's usually more straightforward, is the only way I know how to say it."

Nicole Bajoie testified that she was employed at ChildHelp and, on October 13, 2009, interviewed [the victim]. The interview was video-recorded, and a portion of the recording was played for the jury. The trial court instructed the jury that it was to consider the recording only for the issue of the witnesses' credibility. After the tape was played, Bajoie testified that she recalled [the victim] telling her that the touching did not happen anywhere other than the [petitioner]'s chair.

On cross-examination, Bajoie confirmed that [the victim] had told her that the [petitioner] had touched her on the inside of her "private" with his finger. [The victim] did not say that anyone else had touched her and denied that anyone else had touched her.

Father testified that he is the [petitioner]'s son and [the victim]'s father. He continued to have a good relationship with [the victim] after her accusations against the [petitioner] arose. He had been told not to speak with her about the allegations, and he respected that instruction. Mother spoke to him about her dream and told him that, in her dream, the person of concern was Ailey.

Father testified that the [petitioner] had a reputation for truthfulness and stated that "[h]e's a very honest person." He testified that the [petitioner]'s testimony should be believed. He also testified that, although he loved [the victim] "very much," he also believed that her reputation for truthfulness was "[b]ad."

Ashley Yoder testified that she is Mother's sister. She eventually began dating Father, which caused a year-long rift in her relationship with Mother, but they had since reconciled and had a "good" relationship.

Yoder and Father had three children together, and their children spent time with [the victim] and Nicholas. She stated that her relationship with [the victim] was "really good" and that [the victim]'s accusations had not affected it.

At one point after the accusations arose, [the victim] asked to go with Yoder to the [petitioner]'s house. Yoder took her and told her that she could wait in the car while Yoder picked up her children, but [the victim] wanted to go inside. They stayed about thirty minutes. Nicholas continued to visit at the [petitioner]'s house, and Mother would take him there to spend the night.

Yoder described her relationship with Ailey as "neutral" and added that the children "don't seem to like him too much."

Yoder stated that the [petitioner] had a reputation for truthfulness and that his testimony should be believed. She also stated that [the victim]'s reputation for truthfulness was "bad."

The State called Officer Lynn Everett of the KPD in rebuttal. He assisted Officer Taylor in interviewing the [petitioner] at the police station. At the beginning, he asked the [petitioner] if he had taken any medications. The [petitioner] told him that he had taken insulin and his blood pressure medication, but nothing else. Officer Everett also testified that, due to his experience as a patrol officer, he was familiar with the characteristics of persons under the influence of intoxicants and controlled substances. He stated that he did not observe such characteristics in the [petitioner] that morning.

On cross-examination, Officer Everett stated that he met the [petitioner] at 9:00 a.m. that morning and stayed with him until 11:30 a.m., when Officer Taylor joined them. During the two and one-half hours before Officer Taylor arrived, the [petitioner] denied having any improper contact with [the victim].

State v. Douglass Leon Lyle, No. E2012-00468-CCA-R3-CD, 2013 WL 1281857, at *1-9 (Tenn. Crim. App. Mar. 28, 2013), perm. app. denied (Tenn. Sept. 11, 2013).

The petitioner filed a *pro se* petition for post-conviction relief on April 10, 2014, and, following the appointment of counsel, two amended petitions were filed. In his petitions, the petitioner raised various allegations of ineffective assistance of counsel,

including the ground pursued on appeal – that counsel was ineffective for not calling his wife (and the victim's grandmother) to testify on his behalf at trial.

At the evidentiary hearing, the petitioner presented the testimony of his wife who stated that she and the petitioner had been married for thirty-nine years and had lived together the entire time. She said that the victim in this case is her granddaughter, with whom she had a "very good" relationship. She recalled that, during the years from 2006 to 2009, the victim and her brother were at her and the petitioner's home often. During that timeframe, the petitioner's wife usually slept on the couch in the living room, and the petitioner slept in the master bedroom. The petitioner usually went to bed earlier than she and awoke before her in the morning. When the victim spent the night at their house, the victim would wake up at different times. The petitioner's wife elaborated, "Sometimes I would wake up and she would still be asleep."

The petitioner's wife testified that the victim never appeared to be afraid of the petitioner. In describing how the petitioner and victim interacted, the petitioner's wife said: "She would roll all over that man. She played. She jumped on him. She run down his back. She would comb his hair." The petitioner's wife said that other children also frequently visited their home, and none appeared to be apprehensive of the petitioner. She never observed any inappropriate behavior between the petitioner and any of the children who came into their home. There was nothing about the petitioner's behavior that would indicate he was sexually attracted to the victim.

The petitioner's wife testified that the petitioner spoke with investigators after the allegations surfaced but before the petitioner was charged. She said that the conversations occurred voluntarily, before they consulted with counsel. She recalled that, prior to the interview at the police station, the petitioner was nervous and asked for "something to calm his nerves." The petitioner sometimes took "a half of a half of a milligram" of Xanax, but she gave him a full milligram of the medication. The petitioner's wife surmised that the petitioner had also probably taken his prescription medications for blood pressure, cholesterol, and diabetes that day.

The petitioner's wife testified that the petitioner was coherent and in his right mind during their drive to the police station for the interview. She was not allowed to be present during the interview. It lasted four and a half hours, during which she waited in the lobby. When the petitioner returned from the interview, he was "incoherent" and "shaky," and he wanted to get something to eat. His condition improved after eating. On cross-examination, the petitioner's wife admitted that Xanax did not cause her to say something that was not true.

13

After the conclusion of the hearing, the post-conviction court entered a written order denying relief. The court found that the petitioner's wife's testimony was "simply corroborative" of other testimony at trial and that the petitioner did not prove that "the decision to not call Petitioner's wife as a witness was no more than a tactical decision." The court concluded that the petitioner "failed to prove deficient performance of counsel and prejudice to the defense, the two required elements of ineffective assistance of counsel."

## ANALYSIS

On appeal, the petitioner argues that the post-conviction court erred in finding that he did not receive ineffective assistance of counsel. He asserts that counsel performed deficiently by failing to call his wife to testify on his behalf at trial and that such deficient performance caused him prejudice. He claims that his wife would have been a more effective witness to his behavior during the time period of the alleged incidents, as well as his demeanor before and after his interview with the police, than the other witnesses who testified.

The post-conviction petitioner bears the burden of proving his allegations of fact by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

14

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

As noted above, the post-conviction court found that the petitioner's wife's testimony "[a]t best . . . would have been cumulative." The court noted that "there was ample proof in the record from [the petitioner]'s testimony about him taking Xanax, the effect of it" and that "other witnesses were presented that also testified about his relationship with other children." The court concluded that the petitioner failed to show that counsel's "tactical decision not to call [the petitioner's wife] as a witness was ineffective and has also failed to show that the result of the outcome of this trial would have been different as a result of her testimony."

After review, we conclude that the record supports the findings of the post-conviction court. The petitioner claims that his wife could have testified that she never observed any inappropriate contact between the petitioner and the victim. However, the

15

victim testified at trial that the inappropriate contact occurred when her grandmother was asleep. <u>Douglass Leon Lyle</u>, 2013 WL 1281857, at *2. In addition, even though the petitioner's wife could have testified that she never saw the victim express fear of the petitioner, four other witnesses testified similarly to that at trial. <u>See</u> <u>id.</u> at *7-8.

The petitioner also claimed that his wife's testimony could have helped challenge the credibility of his confession by testifying concerning his taking a Xanax pill before his interview with police and that he appeared "shaky" and "incoherent" after the interview. However, the petitioner himself testified at trial that he took three Xanax pills prior to his interview and that he could not remember what happened in the interview room after the officer entered. <u>See</u> <u>id.</u> at *5-6. Moreover, the petitioner's wife could not testify concerning the petitioner's condition during the interview, and she testified at the evidentiary hearing that she saw no difference in the petitioner's behavior before and after taking the Xanax prior to his going in for the interview. In addition, counsel retained an expert who testified at trial that Xanax "can cause a drop in blood pressure, an increase in heart rate, and 'a degree of confusion and some short-term memory loss.'" <u>Id.</u> at *6. As determined by the post-conviction court, the petitioner's wife's testimony would have merely been cumulative to the evidence presented, and we cannot conclude there was any reasonable probability that the result of the proceeding would have been different had the petitioner's wife testified at trial.

## <u>CONCLUSION</u>

Based on the foregoing authorities and reasoning, we affirm the judgment of the post-conviction court denying the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE

16